FILED

2005 Nov-17  AM 08:38
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

MARIANN COLLINS,

     PLAINTIFF,

v.                                      CV04-J-2446-S

COMPETENT STAFFING RESOURCE,
INC.,

     DEFENDANT.

## MEMORANDUM OPINION

Pending before the court is defendant, Competent Staffing Resource, Inc.'s ("CSR") motion for summary judgment, evidentiary submissions and brief in support of said motion (docs. 21-22), plaintiff Collins' response to said motion (doc. 23)[1] and defendant's reply brief (doc. 28).  The court has reviewed the motion, the memoranda of law, and the evidentiary submissions of the parties.  Upon consideration of the pleadings, briefs, and evidentiary submissions, the court concludes that the defendant's motion for summary judgment is due to be **GRANTED.**

---

[1]Plaintiff also submitted an affidavit in support of her response (doc. 24). Upon motion of the defendant (doc. 26) said affidavit was stricken by separate order (doc. 27).

# I. Procedural Background

Plaintiff Collins commenced this action on August 10, 2004 by filing a complaint (doc. 1) alleging that defendant failed to place her in two positions with BellSouth because of her gender in violation of the *Civil Rights Act of 1964,* as amended, 42 U.S.C. §2000e *et seq.*

# II. Factual Background

CSR was founded in 1996. It provides temporary staffing solutions for the telecommunications industry, which are called CSR's Customers. Since 1996 it has solicited more than 5,000 resumes from people, such as plaintiff, who have indicated an interest in working temporarily for CSR's Customers. CSR has subject matter experts who use key words to describe the qualifications reflected in the resumes of these persons, who in the industry are known as CSR's Contractors. The key words, which reflect that Contractor's qualifications, are then correlated with the Contractor's name. The key words and the Contractor's name are then entered into CSR's data base along with the Contractor's resume. Hoff Decl. ¶ 2;[2] Malmquist depo. at 36.[3] A good portion of the time the Customers of CSR request Contractors by name to fill temporary positions. The

---

[2]Ron S. Hoff is Vice President and one of the founders of CSR. Hoff Decl. at ¶ 1.

[3]Bob Malmquist is also one of the founders of CSR. Malmquist depo. at 12.

remainder of the time, CSR receives the requirements in the notice of a temporary position.  CSR's experts match the requirements expressed by the Customer with the information in its data base using CSR's key words method, and then CSR transmits its information about its best qualified candidates to the Customer.  The Customer has the option of either selecting a candidate from the list or rejecting them all.  If a candidate is selected by the Customer, and the candidate agrees, the candidate executes an employment contract with CSR and becomes an employee of CSR for the duration of the temporary  assignment with the CSR Customer.  Hoff Decl. ¶ 2-3; Malmquist depo. at 42-45.

A Customer may extend the assignment.  If so, the employment of the Contractor is extended proportionally with CSR.  It is also not uncommon for CSR's Customers to terminate assignments sooner that originally anticipated.  If that occurs the Contractor's assignment with the Customer is terminated and the Contractor ceases to be an employee of CSR.  When an assignment is terminated between CSR and the Customer, the employment relationship between the Contractor and CSR likewise ceases.  Hoff Decl. ¶ 4.

Information about the Contractor (sometimes updated by the Contractor to reflect additional skills obtained as a result of his or her most recent assignment) remains in the CSR data base.  That Contractor, along with everyone else in the

data base, is considered for future requirements.  Because the key words system searches CSR's entire data base, every Contractor in the data base is considered by CSR for every requirement except the by-name requests received from the Customers of CSR.  Hoff Decl. ¶ 4.

CSR derives revenues from the bills it sends to its Customers for work performed by its Contractors.  The billing rate is always greater that the hourly rate CSR pays the Contractor.  Hoff Decl. ¶ 5; Exh. 6 to Hoff depo.

If a person through his or her own contacts finds a temporary position with one of CSR's Customers, such individual may ask CSR or one of its competitors to bill the Customer for that person's services.  If such an agreement is reached between such person and CSR, the person becomes an employee of CSR for the duration of his or her temporary position with such CSR Customer.  Hoff Decl. ¶ 6; Wolfe Decl. ¶¶ 3-4.

Plaintiff began working for CSR in 2000.  Collins  Depo. at 88, 97. Her first contact person with CSR was Don Lightsey.  *Id.* at 88.  Plaintiff's first assignment with CSR was in Michigan where she was contracted to Siemens who in turn contracted with AT&T.  Collins depo. at 89, 94.  Plaintiff was paid $520 per day plus travel benefits.  Exh. 1 to Collins depo.  After that job ended, plaintiff was employed as a Contractor for another contracting company, Diversified Executive

4

Services, who contracted plaintiff to BellSouth.  Collins depo. at 97-98.

Thereafter,  CSR contacted the plaintiff when a position came open in the

Colonnade.  It was a contract assignment as a business analyst for BellSouth

which plaintiff held for three years, until May 2003.  Collins depo. at 98-99.  This

assignment was originally for a three-month term.  Hoff  Decl. ¶ 7.  BellSouth

repeatedly extended plaintiff's assignment by name.  *Id.*  Several months before

the plaintiff's assignment with BellSouth ended, she heard rumors that BellSouth

would no longer employ contract  persons.  Collins depo. at 119-120.  Plaintiff

notified CSR field representative Don Lightsey that her assignment with

BellSouth as a business analyst would terminate at the end of May.  *Id.; see also*

Exh. A to Hoff Decl.  It is not unusual for the Contractor to obtain such

information from the Customer before CSR is informed .  Hoff Decl. ¶ 7.  The

temporary assignments of other CSR Contractors working as business analysts for

BellSouth also ended about that time. One of these Contractors was John Summers

whose temporary assignment with BellSouth as a business analyst ended June

2003.  Hoff Decl. ¶ 7.  When plaintiff told Don Lightsey that she had heard that

BellSouth no longer wanted contractors, Lightsey answered that he knew

BellSouth was looking to do that. Collins depo. at 120.  *See also* Hoff depo. at 61.

Plaintiff then told Lightsey that "well, we need to start, you know, looking, like a

contractor would do – you know, we need to start looking and he said that he would." Collins depo. at 120. Plaintiff sent an updated resume to CSR. *Id.* Plaintiff explored the possibility of permanent employment with BellSouth during this period of time, but it did not work out. Collins depo. at 122, 124, 127-132. A female was chosen by BellSouth for the position. *Id.* at 132. Lightsey also went to work for BellSouth during this time frame. *Id.* Plaintiff then posted her resume on the web sites of several companies with which she was familiar. Collins depo. at 125. Thereafter plaintiff was out of work for a couple of months. Collins depo. at 115. She then worked through another contracting firm, Matrix, at BellSouth as a project manager for six to seven months until January 2004. Collins depo. at 116-118. Plaintiff was then  unemployed for nine months. Collins depo. at 31, 118. Plaintiff has been employed at Healthsouth since September of 2004 first as a Contractor through ACP and then as a full time employee since December 2004. Collins depo. at 31-33.

The two male employees whom plaintiff claims were re-employed by CSR under contract with BellSouth are Brady Wolfe and John Summers. Collins depo. at 147, 255. Plaintiff claims CSR discriminated against her because of her gender when CSR made these two employment decisions. Collins depo. at 177, 255.[4]

---

[4]In her complaint, plaintiff alleged that Don Lightsey replaced her when he took a position with BellSouth and stopped being a field representative in June of 2003. Complaint at ¶

**Summers' assignment.**

Summers worked for CSR as a business analyst in the same BellSouth department as plaintiff.  Hoff Decl. ¶ 7; Hoff depo. at 25-26.  Summers' temporary assignment with BellSouth was extended through the end of June 2003.  Hoff Decl. ¶ 7.  Summers was subsequently selected by CSR to become a CSR employee.  *Id.* Summers helped CSR fulfill a product delivery contract with BellSouth Long Distance to inventory its telecommunications equipment in a number of states.  *Id.* This was a sporadic, as-needed job for which John Summers was well qualified. *Id.*  Hoff depo. at 86-88.  Hoff selected Summers for this position after a normal keyword search.  Hoff Decl. ¶¶ 2, 7; Exh. B to Hoff Decl.  Plaintiff did not interview for the position.  Collins depo. at 177-178; Hoff Decl. ¶ 8.  Neither did more than 5,000 other Contractors in CSR's data base.  Hoff Decl. ¶ 8.  By virtue of being in CSR's data base plaintiff was considered for the position.  *Id.*  Summers was selected for the position because of his qualification.  *Id;* Hoff depo. at 87-88. Plaintiff believes that she would have gotten Summers' position if she had interviewed for it.  Collins depo. at 193.  However, she has never seen a job description for this position.  Collins depo. at 260.  When plaintiff contacted Hoff

---

8. Plaintiff withdrew this claim at her deposition testimony and testified that she did not know what the qualifications were for Lightsey's job, did not know whether she was qualified, or what her qualifications were relative to Lightsey's. Collins depo. at 186-87.

about additional assignments after her assignment ended in May of 2003, Hoff told her he would "put her in this huge data base and if a match was found he would contact [her]."  Collins depo. at 201.  Plaintiff called Hoff back approximately one week later in June of 2003 and asked him what was going on.  Hoff told her that there was not a lot going on and that nothing was available at that time.  Towards the end of June plaintiff contacted her lawyer.  Collins depo. at 203.  Summers' assignment  was filled as a result of such data base search.  Hoff Decl. ¶ 8. Summers was well qualified for this position.  *Id.*  In Hoff's opinion, plaintiff does not have the field or hands-on experience required to fill the assignment that Summers was selected for.  Hoff Decl. ¶ 9.  Her resume does not indicate any experience in working with the kind of equipment CSR inventoried for BellSouth Long Distance.  Plaintiff's resume reflects that all of her telecommunications work experiences have been in project management within Information Technology (IT) arena. *Id., see* Exhs. C, D, E to Hoff Decl.  *See also* Collins depo. at 70, 73.[5] Plaintiff does not believe that executives of CSR dislike her.  When asked if she had had any conversation with Lightsey,  Hoff or Sluter that caused her to come away from that conversation thinking that these executives did not like women, she

---

[5]When asked what a TAT line is, plaintiff answered: "It's a cable that goes under the water between out eastern seaboard and Europe. It's a TAT cable." Upon being asked if she knew what TAT stands for, plaintiff replied "[n]o, I don't." Collins depo. at 72.

answered, "Not so much women as much as the group that they hold dear to their hearts is known as the good old boys club, and they take care of their own. And it's all men."  Collins depo. at 208.  When asked "[w]hat is the good old boys club?" she answered "[i]t's all BellSouth employees that have previously worked there. CSR is made up of that.  That's how they're in BellSouth and that's how they maintain contract positions at BellSouth."  *Id.*, at 208-209.  Plaintiff proceeded to state "[h]ere is my stance on that.  Women are not part of their group.  Women are just as qualified as the men they hold dear to their hearts.  And I think in this day and age it needs to open up a little bit more than it is today."  Collins depo. at 210.

**Brad Wolfe's new position**

Brad Wolfe was another employee of CSR who worked with plaintiff and whose assignment with BellSouth as a business analyst ended in the summer of 2003.  Hoff Decl. ¶ 11; Hoff depo. at 25-26; Wolfe Decl. ¶ 2.  When Wolfe learned that his assignment with BellSouth was coming to an end in the summer of 2003, he contacted Charlie Garris, BellSouth's Director, Program Management, and asked him about opportunities to continue with BellSouth.  Wolfe Decl. ¶3; Hoff Decl. ¶ 11.  Wolfe had two prior assignments with BellSouth as a Contractor and Garris knew Wolfe and was familiar with his qualifications.  Wolfe Decl. ¶¶ 2, 3. Garris agreed to place Wolfe in a fourth assignment with BellSouth after his third

assignment ended in the summer of 2003.  Wolfe Decl. ¶ 3. Neither CSR nor

anyone else referred Wolfe to Garris or assisted Wolfe in locating this assignment.

*Id*; Hoff  Decl. ¶ 11.  Upon learning that Garris wanted Wolfe in the contract

assignment, Wolfe knew that the mechanics of his actually filling the assignment

had to be handled through a contracting company.  Since he had had good

experiences with CSR, and was then working through CSR, he asked Ron Hoff of

CSR if CSR could make the arrangements for him to assume the new contract

assignment.  CSR agreed to do so.  Wolfe Decl. ¶ 4.  Wolfe never believed that

CSR would provide  replacement employment for him at the end of a contract

assignment.  Wolfe Decl. ¶ 5.  He too was aware that BellSouth had begun

eliminating contract positions and replacing them with permanent employees

during the summer of 2003.  *Id.*  Plaintiff did not apply for the position Wolfe

sought and received.  Collins depo. at 177-178.  She thinks she is better qualified

than Wolfe for that position and thinks that had she interviewed for it she would

have received it.  Collins depo. at 191-93.  CSR has no preferential treatment

policy to any employee who has been on a contract and that contract ended.  They

would go back in the total candidate pool, they would no longer be employees, they

would be in the data base and would be considered for new positions if their skills

were found  to match through a search of CSR's data base.  Malmquist depo. at 77.

10

There is nothing in plaintiff's contracts or their renewals with CSR that obligates CSR to find her another position when her contract job has ended. Exhs. 1, 2 to Collins depo. *See also* Exh. 6 to Hoff depo. Plaintiff agrees that the contract does not provide for this. Collins depo. at 155-57.

### III. Standard of Review for Evaluating a Summary Judgment Motion

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986). As the Supreme Court has explained the summary judgment standard:

> [T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.

*Celotex Corp.* 477 U.S. at 322-23. The party moving for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrates the absence of a genuine issue of material fact. *Id.* at 323. The burden then shifts

11

to the non-moving party to "go beyond the pleadings and by ...affidavits, or by the 'depositions, answers to interrogatories, and admissions on file' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex Corp.,* 477 U.S. at 324, Fed.R.Civ.Pro. 56(c).  In meeting this burden the nonmoving party "must do more that simply show that there is a metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). That party must demonstrate that there is a "genuine issue for trial." Fed.R.Civ.Pro. 56(c);  *Matsushita,* 475 U.S. at 587.  *See also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986). The non-movant must "demonstrate that there is indeed a material issue of fact that precludes summary judgment."  *Clark v. Coats & Clark, Inc.,* 929 F.2d 604, 608 (11th Cir. 1991).

On motions for summary judgment, the court shall construe the evidence and factual inferences arising therefrom in the light most favorable to the non-moving party.  *See Adickes v. S. H. Kress & Co.,* 398 U.S. 144, 157 (1970).  The substantive law will identify which facts are material and which are irrelevant. *Anderson,* 477 U.S. at 248.  All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the nonmoving party.  *Fitzpatrick v. City of Atlanta,* 2 F.3d 1112, 1115 (11th Cir. 1993).  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."

*Anderson,* 477 U.S. at 248.  If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.  *Id.* at 249-250.  The basic issue before the court on a motion for summary judgment is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52.

## IV. Legal Analysis

Plaintiff claims that she should have received the positions that went to Summers and Wolfe after their positions with BellSouth expired in 2003. Plaintiff has no direct evidence of discrimination.  Accordingly, the *McDonnell Douglas* burden shifting analysis is applicable to the case. *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802 (1973).  To establish that she was discriminated against by CSR on account of her gender, plaintiff must prove that: (1) she is a member of a protected class; (2) she suffered an adverse employment action; (3) CSR treated similarly situated employees outside the protected class more favorably; and (4) she was qualified to do the job. *Scott v. Suncoast Beverage Sales, Ltd.,* 295 F.3d 1223, 1228 (11th Cir.2002); (citing *McDonnell Douglas Corp. v. Green,* 408 U.S. 792, 802 (1973)).  Plaintiff cannot establish the second, third and fourth elements of her *prima facie* case, and her claims are therefore due to be dismissed.

13

The fact that she was not interviewed for the two positions does not mean that she suffered an adverse employment action any more than the other more than 5,000 contractors in CSR's database.  It is uncontradicted that CSR took no action with regard to the position awarded to Brad Wolfe, and because plaintiff was not qualified for the position awarded to John Summers, plaintiff cannot show that CSR treated Summers or Wolfe more favorably than it treated her.  Summers was selected for the position through the regular keyword search of CSR's database in an objective, analytical manner which resulted in Summers being found the most qualified for the position. Plaintiff cannot, as she did in her deposition, rely on conclusory assertions that CSR is some sort of "good old boy" network that shut her out of the positions she now claims she should have received.  *See Earley v. Champion International Corp.,* 907 F.2d. 1077, 1081 (11th Cir. 1990)(a plaintiff must present "concrete evidence in the form of specific facts" supporting her discrimination claim, and if she fails to do so, the employer is entitled to summary judgment).  Moreover, plaintiff has presented no evidence other than her own conclusions that her qualifications were equal to or comparable to those of Summers.  Plaintiff has never even seen a job description for this position.  Collins depo. at 260.  Plaintiff's own subjective belief is not relevant.  *Simms v. Oklahoma ex rel. Dept. of Mental Health and Substance Abuse Services,* 165 F.3d 1321, 1329

(10th Cir. 1999) (an employee's "own opinions about [her] ...qualifications [do not]

give rise to a material factual dispute" ).  CSR has presented detailed evidence that

Summers was more qualified for the position he obtained with BellSouth.  Hoff

Decl. ¶¶ 7-10.  It is not the court's role to second guess the wisdom of an

employer's decision so long as the decisions are not unlawfully motivated.  *See*

*Alexander v. Fulton County,* 207 F.3d 1303, 1341 (11th Cir. 2000).  Nor has

plaintiff produced any evidence that CSR had anything to do with Wolfe obtaining

his position, or, more importantly, that CSR had involvement in her not obtaining

that position.  Additionally, plaintiff admits that CSR had no contractual duty to

find her a new position when her business analyst assignment with BellSouth

ended in 2003.  Her allegations that "professionalim" obligated CSR to find her a

new position or that CSR had a "moral obligation" to do so do not amount to proof

that CSR had a contractual obligation to do so or owed plaintiff a legal duty.

Collins depo. at 159-160, 163.  Plaintiff admitted that when she talked to

Malmquist in June of 2003, he agreed to place her name in the data base and let her

know if CSR found a match.  Collins depo. at 201.  Plaintiff has presented no

evidence that CSR ever tries to find employment for **any** of its employees at the

end of their assignments, much less for male employees similarly situated to

plaintiff.  Plaintiff has presented no evidence that she was not considered for these

positions on account of her gender.[6]  Summary judgment is appropriate where evidence of discriminatory intent is totally lacking. *See Mulhall v. Advance Sec., Inc.,* 19 F.3d 586, 598 (11th Cir. 1994).  Plaintiff was not interviewed for the position that went to John Summers because her name was not selected by CSR's computer as a person with the skills necessary to fill that position.  Plaintiff was not selected by CSR to interview for the position that went to Wolfe because CSR had nothing to do with BellSouth filling that position.

In consideration of the foregoing, the court finds that the defendant's motion for summary judgment is due to be granted, as no genuine issues of material fact exist.

### V. Conclusion

It is therefore **ORDERED** that defendant's motion for summary judgment be and hereby is **GRANTED.**

Done and Ordered this the 16th day of November, 2005.

_____
INGE PRYTZ JOHNSON
U.S. DISTRICT JUDGE

---

[6]At the most, plaintiff may be accusing BellSouth, as opposed to CSR, of some bias against women. Collins depo. at 208-209.

16